J-S17031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:<br>H.R.N., A MINOR | IN THE SUPERIOR COURT<br>OF<br>PENNSYLVANIA |
| APPEAL OF: K.M.T., MOTHER | |
| | No. 2889 EDA 2017 |

Appeal from the Order entered August 7, 2017,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000711-2017.

| | |
|---|---|
| IN THE INTEREST OF:<br>R.R.N., A MINOR | IN THE SUPERIOR COURT<br>OF<br>PENNSYLVANIA |
| APPEAL OF: K.M.T., MOTHER | |
| | No. 2891 EDA 2017 |

Appeal from the Order entered August 7, 2017,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000517-2017.

| | |
|---|---|
| IN THE INTEREST OF:<br>G.N., A MINOR | IN THE SUPERIOR COURT<br>OF<br>PENNSYLVANIA |

J-S17031-18

No. 2894 EDA 2017

Appeal from the Order entered August 7, 2017,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000518-2017

IN THE INTEREST OF:
L.R.N., A MINOR

IN THE SUPERIOR COURT
OF
PENNSYLVANIA

APPEAL OF: K.M.T., MOTHER

No. 2897 EDA 2017

Appeal from the Order entered August 7, 2017,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s): CP-51-AP-0000519-2017.

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MAY 30, 2018**

K.M.T. ("Mother") appeals from the orders terminating her parental rights to her four children: L.R.N. (11 years old); G.N. (9 years old); R.R.N. (3 years old); and H.R.N. (3 months old).[1]  Her rights to her older three children – L.R.N., G.N., and R.R.N. – were terminated pursuant to 23 Pa.C.S.A. §2511(a) (1), (2), (5), (8) and (b).  Mother's rights to her youngest, H.R.N.,

---

[1] Ge.N, Father, also appeals, but his case is before a separate panel of this Court.  *See* 2824, 2826, 2827, 2828, EDA 2017.

- 2 -

were terminated pursuant to 23 Pa.C.S.A. §2511(a) (1), (2), (4), (5), (8) and (b). After careful review, we affirm as to the three eldest children, but reverse as to H.R.N.

The relevant facts and procedural history of this case are extensive, but they may be summarized as follows. The parties first came to the attention of the Department of Human Services ("DHS") in November 2009. Mother had taken L.R.N. to the hospital, alleging Father physically abused the child. The hospital found no evidence of physical abuse and the child was released the same day. At the hospital, however, Mother appeared to be under the influence of an unknown substance. Some combination of these two facts precipitated DHS involvement. Soon thereafter, DHS confirmed that Mother was prescribed Seroquel and Methadone. DHS developed a Safety Plan to relocate Mother and her children (L.R.N. and G.N.) to the Eliza Shirley Red Shield shelter. The family was discharged two weeks later in December 2009 when Mother and the children failed to return to the shelter. Mother took the children to DHS. After Mother tested positive for benzodiazepines, DHS created a new safety plan where the maternal grandparents would serve as caregivers to L.R.N. and G.N. In late December 2009, Mother was arrested for shoplifting. At that point, DHS obtained a protective custody order for the children, who remained in the care of their maternal grandparents.

In January 2010, the juvenile court adjudicated the children dependent. Father was ordered to undergo a drug and alcohol screen and a dual diagnosis assessment; the court found Mother received inpatient treatment at My

Sister's Place, where she was residing. The children joined Mother soon thereafter.

In June 2010, the children were again removed to the care of the maternal grandparents. Over the next year and a half, the juvenile court found the parents to be minimally compliant with their reunification goals. The parents eventually complied with the permanency plan, however; and in late December 2011, the children were reunified with their parents. The dependency case was then closed for nearly three years.

In November 2014, DHS received a report alleging that the parents left then-6-year-old G.N. and then-8-month-old R.R.N in the care of the eldest child L.R.N., who was 8 years old. A subsequent investigation revealed that Mother and Father were abusing OxyContin, Percocet, Klonopin and Xanax. There was limited food in the home. The home was dirty and cluttered with trash, thereby creating a fire hazard. The parents were also selling their food stamps, and asking neighbors for food and baby formula. L.R.N. was suffering from asthma; G.N. had Attention-Deficient Hyperactivity Disorder.

Although the children remained in the home, DHS discovered a number of concerns over the following year. Mother failed to provide the results of her drug tests to DHS' service providers. Mother reported that armed neighborhood men had threatened to kill her family. Mother failed to enroll in mental health treatment. A DHS service provider had to assist Mother by transporting her and the children to their dental appointments; the two older children had 23 cavities between them. Mother did not ensure G.N. received

his daily medication. During home visits, a service provider suspected Mother was under the influence. Mother was diagnosed with multi-personality disorder and bipolar disorder. The children were eventually adjudicated dependent for the second time in December 2015.

At the ensuing permanency review hearing in March 2016, Mother appeared to be under the influence. Her lack of compliance with drug screens led to the children being placed out of her care. Mother's compliance with DHS' Single Case Plan was minimal throughout the following year. In April 2017 Mother gave birth to H.R.N.; Mother had no prenatal care and DHS was evidently unaware she was pregnant. The new baby had low scores on the Appearance, Pulse, Grimace, Activity Respiration (APGAR) scale. Although she previously had been prescribed Suboxone, Mother was purchasing and using the drug illegally at that time. The baby was treated at the hospital for Suboxone withdrawal symptoms. Upon her release from the hospital, H.R.N. was placed in the care of a maternal aunt. H.R.N. was adjudicated dependent on May 11, 2017. DHS filed its petition to terminate the parents' rights as to the three eldest children on May 5, 2017; H.R.N.'s petition was filed on July 11, 2017. On July 13, 2017 the three oldest children transitioned from their placement with maternal relatives to their pre-adoptive placement with paternal aunt. It appears the baby, H.R.N., remained with a maternal aunt, but was also in the processing of transitioning to the same paternal aunt.

On August 7, 2017, the trial court terminated Mother's rights in the following manner: As to L.R.N., G.N., and R.R.N., Mother's rights were

terminated as to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). As to H.R.N., Mother's rights were terminated as to 23 Pa.C.S.A. § 2511(a)(1), (2), (4), (5), and (8).

In her brief, Mother submits to us two questions:

1. Did DHS sustain the burden that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

2. Was there sufficient evidence presented to establish that it was in the best interests of the child to terminate Mother's parental rights?

Mother's Brief, at 4.

Our standard of review regarding orders terminating parental rights is settled:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re S.H.,* 879 A.2d 802, 805 (Pa. Super. 2005). In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *Id.* at 806. We have previously stated:

- 6 -

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*In re J.L.C. & J.R.C.,* 837 A.2d 1247, 1251 (Pa. Super. 2003).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.,* 855 A.2d 68, 73–74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

The termination of parental rights is controlled by 23 Pa.C.S. § 2511. Under this statute, the trial court must engage in a bifurcated process in which it initially focuses on the conduct of the parent under Section 2511(a). *See In the Interest of B.C.,* 36 A.3d 601 (Pa.Super.2012).

In this case, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(1), (2), (4), (5), (8) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

....

(4) The child is in the custody of an agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does not claim the child within three months after the child is found.[2]

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

....

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (2), (4), (5), (8). Additionally, this Court "need only agree with [the trial court's] decision as to any one subsection in order

---

[2] 23 Pa.C.S.A. § 2511(a)(4) was only found to be grounds for termination as to H.R.N.

to affirm the termination of parental rights." *In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super.2004).

For clarity's sake, we divide our discussion between the older three children, whose terminations we affirm, and the youngest child, whose termination we reverse.

We begin with the older three children: L.R.N.; G.N.; and R.R.N. Mother argues that the trial court erred because she had either completed or was in the process of completing her court-ordered reunification goals. But our review of the testimony reveals that in the three years since the DHS case was reopened, Mother's compliance was minimal. *See* N.T., 8/7/17, at 32. Mother did not provide any evidence that she complied with her drug screening. In fact, Mother was caught trying to falsify a drug test when it was discovered she brought a condom full of urine to the screen. *Id.*, at 19. Because Mother appeared to be under the influence during her visits with the children, the court suspended the visits. *Id.*, at 25; 34. Even after they resumed, Mother's lack of participation in the reunification process did not warrant anything more than weekly, two-hour supervised visits. *Id.,* at 44. Mother could not provide the caseworker with documentation that she sought mental health treatment. Mother testified that she is now employed as a caretaker, hired by the brother of her elderly charge. *Id.*, at 96. However, that employment did not commence until July 1, 2017, around two months after DHS filed its termination petition. Section 2511(b) provides that the court may not consider any effort by the parent to remedy the conditions

described in subsection (a)(8) if that remedy was initiated after the parent was given notice that termination petition had been filed. 23 Pa.C.S.A. §2511(b); *see also In re D.W.*, 856 A.2d 1231, 1234 (Pa. Super. 2004).

While the trial court found that DHS met its burden of proof under each of the four subsections of the termination statute referenced above, we can affirm the termination if we agree with the decision of any one of those subsections. *See In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004). Here, we agree with the trial court's decision on subsection (a)(8).

In order to satisfy subsection 2511(a)(8), DHS must show the following three elements: (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Termination under subsection 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement of his or her children. *In re Adoption of J.N.M.,* 177 A.3d 937, 943 (Pa. Super. 2018); *see also In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017).

Here, the court gave Mother several years to remedy the conditions that led to the children's repeated removals. The final removal occurred in March 2016; thus, the twelve month time period was satisfied. Despite DHS working with her over many years, Mother failed to participate in any meaningful drug or mental health treatment. Her visitations were suspended because of

apparent drug use. The visits she had were supervised. At the time of the termination, the conditions that led to these children's removal still existed. Finally, for the same reasons that will be discussed below regarding 2511 (b), the trial court concluded that termination would best serve the children's needs and welfare. We agree.

Having established that section 2511(a)(8) was a proper ground for terminating Mother's parental rights, we must now determine whether termination would serve the children's needs and welfare under section 2511(b). ***See id.***

Section 2511(b) provides, in pertinent part:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

Pursuant to Section 2511(b), the trial court must take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. ***In re C.S.**,* 761 A.2d 1197, 1202 (Pa. Super. 2000) (*en banc*). In ***In re C.M.S.**,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that

the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.,* 946 A.2d 753, 763 (Pa. Super. 2008).

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." As we explained in *In re N.A.M.*:

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

33 A.3d 95, 103 (Pa. Super. 2011) (*citing In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Moreover, we have found terminations to be proper despite the existence of a parent-child bond when the bond is not necessarily meaningful or healthy. *In re M.M.*, 106 A.3d 114, 120 (Pa. Super. 2016); *see In re T.S.M.,* 71 A.3d 251, 268 (Pa. 2013) (stating that the strong

parent-child bond was an unhealthy one that could not by itself serve as grounds to prolong foster care drift); *see also In re L.M.,* 923 A.2d 505, 512 (Pa. Super. 2007) (holding that a parent's love of her child, alone, does not preclude a termination).

Since their last removal in March 2016, the three eldest children largely have been placed with family. At the time of the hearing, they had been placed with their paternal aunt, who is their pre-adoptive foster parent. Prior to that, they were with their maternal grandmother. Although there was no bonding evaluation conducted between the children and their paternal aunt, the aunt is someone the children know. Additionally, DHS caseworker testified that the children have adjusted well in the home. N.T., 8/7/17, at 74. The caseworker testified, and the trial court agreed, that although the two oldest children, L.R.N. and G.N., are bonded with Mother, this bond is not beneficial or necessary. The court also concluded that this bond is outweighed by the children's need for stability and safety. We agree. The children – especially the oldest two children – have experienced a tumultuous childhood thus far. DHS involvement began 9 years ago. Since then, Mother has never maintained any prolonged sobriety. The children were removed multiple times and have had to endure various placements. Moreover, Mother had often neglected them to the point where their health suffered. When they finally got to a dentist, two of the children had nearly two dozen cavities between them. Apart from the physical effects of Mother's neglect, their lack of permanency could have long-term consequences on their mental health.

The children currently suffer from mental health issues which Mother has also failed to address; the social worker testified that Mother had not been involved in G.N.'s behavioral medication management nor has she been involved in his therapy. Because the children are placed with kin, we recognize that they will likely continue to have some contact with Mother. This should mitigate any adverse effect termination might have on the older children. **See In re M.M.**, 106 A.3d 114, 119-120 (Pa. Super. 2014). Additionally any adverse effects are wholly outweighed by the benefits of adoption. We find that the record supports termination of Mother's parental rights as to L.R.N., G.N., and R.R.N. The needs and welfare of these three children will be served by the termination of Mother's parental rights.

With respect to the trial court's decision to terminate Mother's parental rights to youngest child, H.R.N., we must reverse. Initially, we recognize that the trial court's termination under subsection (a)(4) may be based a clerical error. Section 2511(a)(4) provides: "The child is in the custody of the agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does not claim the child within three months after the child is found." This section does not apply to the facts of this case. Perhaps the termination provision was included in DHS's petition to terminate the parental rights of the "Unknown Father." **See** 23 Pa.C.S.A. § 2512(c) ("If the petition does not identify the father of the child, it shall state whether a claim of paternity has been filed under Section [5103] (relating to paternity)).

Curiously, DHS sought – and the trial court granted – termination of the rights of an unnamed father, despite the fact that Father acknowledged paternity of H.R.N., and despite the fact that he and Mother were purportedly married at the time of H.R.N.'s birth. We can surmise no other explanation for this finding other than a clerical error. However, the law does not sever the parent-child bond on this basis.

Similarly inappropriate are the court's findings as to Sections 2511(a)(1), (5), and (8). Each of these provisions have timing requirements before termination is appropriate; the statutory requisite timeframe outlined for Sections 2511(a)(1) and (5) is six months, and for Section 2511(a)(8), it is 12 months. At the time of the termination hearing, H.R.N. was only three months old, and, thus, could only have been without parental care for a period of approximately 3 months. We conclude that the trial court erred when it terminated Mother's parental rights to H.R. N. under these provisions. This leaves only Section 2511(a)(2) as an appropriate ground for termination.

As we stated above, if we were to conclude that Section 2511(a)(2) is a suitable ground for termination, we could affirm the trial court's decision to terminate despite the defects in its analysis regarding the other subsections discussed above. *See In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (requiring only one basis under 2511(a) to affirm the termination of parental rights). However, we are constrained to reverse on this ground as well.

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2)

such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re D.L.B.*, 166 A.3d 322, 327 (Pa. Super. 2017) (*quoting In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015. "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *Id.*

We readily acknowledge that as to the three older children, *years*' worth of facts allowed the trial court to conclude that Mother engaged in this sort of *repeated* and *continued* misconduct. *See* 23 Pa.C.S.A. § 2511(a)(2). The record is replete with examples of Mother's inability to parent those children. But when it comes to H.R.N., the history of Mother's misconduct only began at H.R.N.'s birth three months prior.

Significantly, unlike some of the other subsections of 2511(a),[3] the legislature did not impose any minimum timeframe for termination under subsection 2511(a)(2); nor do we. We are not deciding that three months is too short of a time period for a parent to demonstrate "repeated and continued incapacity, abuse, neglect or refusal" to care for a child. *See* 23 Pa.C.S.A. § 2511(a)(2). Rather, we are constrained to reverse in this case because the record is devoid of any real discussion of H.R.N. or Mother's reunification

---

[3] *See* 23 Pa.C.S.A. § 2511(a)(1), (4), (5), (6), (8).

efforts since H.R.N.'s birth. The DHS Petition to terminate parental rights to H.R.N. was largely an afterthought. We gleaned that the child was adjudicated dependent in May, shortly after Mother tested positive for the substances she abused during her pregnancy. The trial court also found that Mother did not seek prenatal care. But our review of the record indicates that the trial court scheduled only one permanency review hearing between the adjudication hearing in May 2017 and the termination hearing in August 2017. The record shows that this one hearing was scheduled for July 2017 and was then continued because the trial judge was unavailable. During the termination hearing in August 2017, the testimony of the DHS witness focused primarily on the facts surrounding the three older children. Further testimony revealed that Mother had tested both positive and negative for controlled substances since H.R.N.'s birth. These facts are insufficient to prove, especially by clear and convincing evidence, that Mother's misconduct was repeated and continued with respect to H.R.N. Because we reverse as to the Section 2511(a) analysis, we need not discuss the trial court's conclusions as to the bifurcated Section 2511(b) analysis.

We are aware of the fractured state that our decision leaves this family, just as we are aware that the ultimate outcome might be the same, and Mother's parental rights may eventually be terminated. To be clear, nothing we have said here disturbs the trial court's order placing H.R.N. with her siblings in the care of the paternal aunt. Without evidence, however, we are reduced to mere speculation, which can never justify bypassing the

heightened due process afforded to parents engaged in the juvenile court system.

Orders affirmed in part, reversed in part.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  5/30/18